Filed 2/18/26  P. v. Escandon CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>JOSEPH ESCANDON,<br><br>        Defendant and Appellant. | B330244<br><br>Los Angeles County<br>Super. Ct. No. BA432701 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stephen A. Marcus, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Laura Schaefer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Nikhil Cooper, Deputy Attorneys General, for Plaintiff and Respondent.

In 2003, appellant Joseph Escandon shot fellow gang members Frank Barajas, Jr. and Alfred Salinas, Jr. after a verbal argument at a gathering outside his apartment. Barajas Jr. died and Salinas Jr. suffered great bodily injury. In 2005, Escandon also murdered another fellow gang member named Esteban Real pursuant to a greenlight order from the Mexican Mafia. In 2019, a jury convicted Escandon of two counts of first degree murder and one count of attempted premeditated murder and found true the multiple murder and gang murder special circumstances, and gang and firearm enhancements.

On appeal, Escandon challenges the admission of recorded calls and a gang expert's interpretation of them, and the admission of other out of court statements implicating him in the Real murder. He also contends the trial court incorrectly declined to instruct on alibi and coerced the jury into making its true finding on the special circumstances. We reject these arguments.

But we agree with Escandon's insufficiency of evidence claims as to the gang murder special circumstance and gang enhancement for the Barajas Jr. murder and the gang enhancement for the Salinas Jr. attempted murder. We further agree that the instructions for the gang murder special circumstances and gang enhancements did not include the changes made by Assembly Bill No. 333 (2021–2022 Reg. Sess.). We reverse and vacate the true findings for the gang murder special circumstances and gang enhancements for the Barajas Jr. and Real murders and the gang enhancement for the Salinas Jr. attempted murder. We remand the gang murder special circumstance and gang enhancement as to the Real murder only. We affirm the judgment in all other respects.

# FACTS AND PROCEDURAL BACKGROUND

## I.  The Facts

### A.  *The prosecution case*

#### 1.  The Avenues gang and the Mexican Mafia

In the late 1990s and early 2000s, the Avenues gang controlled the area patrolled by LAPD's Northeast Division.  The cliques of the Avenues gang included Drew Street, Five Seven, Division, 43rd, and Assassins.

In the early 2000s, the Avenues gang was under the umbrella of the Mexican Mafia, a prison gang that consisted of 100 to 150 validated members.  The Mexican Mafia ordered predominantly Hispanic streets gangs like the Avenues to collect taxes or extort drug dealers and local businesses.  The money collected was funneled back to the Mexican Mafia.  In the early 2000s, the Avenues gang collected more than $30,000 per week for the Mexican Mafia.  The Drew Street area was considered lucrative for tax collection because its proximity to a freeway facilitated drug sales.

Escandon was a member of the Drew Street clique of the Avenues gang with the moniker of "Lokito."  Between 2005 to 2007, he worked as a top-level tax collector for the Mexican Mafia.

#### 2.  Murder of Frank Barajas, Jr. and attempted murder of Alfred Salinas, Jr.

On January 14, 2003, at 1:30 a.m., LAPD Officer Cesar Rodriguez responded to an assault with a deadly weapon call at 367 Leslie Way, near 5745 Arroyo Drive, in Los Angeles.  He found Alfred Salinas, Jr., who was in his 20s with a shaved head

3

and tattoos on his upper body.  He was an Avenues gang member known as Lil Tigre.  Salinas Jr. had gunshot wounds on his back and stomach.  He told Officer Rodriguez his name and that he had been shot.  But he did not answer any questions because he was in a lot of pain.  Officer Rodriguez did not see any firearm on Salinas Jr.  An ambulance arrived and transported Salinas Jr. to a local hospital.

Officer Steven Aguilar and his partner responded to a "shots fired" radio call at 367 Leslie Way.  After learning that other officers had already arrived, Officer Aguilar heard another radio call generated from 5745 Arroyo Drive.  They parked at the intersection of Arroyo Drive and Leslie Way.  Officer Aguilar saw blood on the sidewalk and beer cans on the ground near an apartment building.  He followed the blood trail northbound on Arroyo Drive where he was flagged down by people who directed him to a person who was two houses north of the apartment.  Officer Aguilar saw a man lying face down with blood coming out of his mouth.  The man was identified as Frank Barajas, Jr., who was an Avenues gang member known as Lil Stretch.  He died from multiple gunshot wounds.

### a.    Olivier Cuevas

On January 13, 2003, leading into January 14, 2003, Olivier Cuevas was in her apartment at 5745 Arroyo Drive when the shooting occurred.  She was Escandon's neighbor.  She lived with Sandra Ramirez.[1]  Sandra's daughter Cassandra Schroeder

---

[1]    Because Sandra Ramirez and William Ramirez share the same last name, we refer to Sandra Ramirez as Sandra and William Ramirez as William or Ramirez.

4

lived in the unit above them.  Cuevas knew Sandra's sons, William and Andy, to be associated with the Avenues gang.

On the night of the shooting, seven to 10 people gathered outside Escandon's apartment.  Cuevas heard them arguing but could not hear what was being said.  She went outside to throw out the trash and saw multiple people from the group chasing each other around and fighting.  Cuevas saw William being chased and told him that his mother was calling him.  William went inside.  Cuevas saw Escandon walking from the driveway toward his apartment unit.  After Cuevas threw out the trash, she saw Escandon come out of his unit, look around, and put his arm up with a revolver in his hand.  Cuevas saw Escandon shoot one person.  After the man was shot, he ran on Arroyo Drive.  He fell after passing two driveways.  Another man ran by the area where Cuevas was.  Escandon followed this man and shot him.  Cuevas hid behind a car.  She saw the others from the gathering run away.

Sandra came outside and walked to the sidewalk where Cuevas was.  Escandon tried to grab Sandra.  Cuevas pushed her to the side and told Escandon, " 'Hey, what are you doing?  Just leave us alone.' "  Escandon pushed Cuevas against a wall.  Escandon pointed the gun at her head and pulled the trigger.  The gun clicked.  Escandon's father and mother approached and got in between him and Cuevas.  Escandon's father pulled him back.  Cuevas grabbed Sandra, and they ran into their apartment.

About 10 or 15 minutes after the shooting, Cuevas jumped out of one of the side windows with William because she did not feel safe inside her apartment.  Sandra remained in the apartment because she was worried about her daughter.  When

Cuevas went outside, she heard someone banging on a door, saying, " 'Help me, help me.' "

According to Cuevas, Escandon moved out of the apartment two to three weeks after the shooting. Three or four weeks after the shooting, Escandon's father blocked Cuevas from leaving her car and said, " 'You fucking bitches better keep your mouths [shut], you fucking dykes.' " He also stated, " 'You guys better get out of here or what happened to [those] guys down here' . . . 'that's nothing compared to what is going to happen to you.' " Cuevas interpreted the statement by Escandon's father to mean that she and Ramirez would be harmed like the victims of the shooting.

Cuevas called the police. When officers arrived, they first spoke to Escandon's father. The officers told Cuevas that " 'nothing happened' " and " 'it's . . . neighbors being neighbors,' " cautioning them " 'to stay out of each other's way' " and " 'just leave it alone.' " Cuevas was too scared to inform the officers that she witnessed the shooting that occurred on January 14.

Ten minutes after the officers left, Cuevas called the landlord of the apartment complex and told him that she was having issues with Escandon's father. She told the landlord about the threat.

On March 15, 2003, Escandon's father again approached Cuevas and threatened her. He stated, "So I know you called the landlord. You guys better keep your mouth shut, and you fucking dykes better get out of here." He further threatened to break her neck and warned, "You better open your eyes and look around before you go outside again." Escandon's father added that they had "better not be snitching" to the landlord. Cuevas went to her unit and called the police. While waiting for officers to arrive,

she looked out her window and saw Escandon's father walking back and forth in front of her unit with a gun in his hand. The officers arrived and took a report from Cuevas.

### b. Cassandra Schroeder

Cassandra Schroeder also lived in an apartment at 5745 Arroyo Drive. She lived with her brother William. Schroeder's other brother Andy, her mother Sandra and Cuevas, and other family members lived in a separate unit in the same complex. Escandon and his girlfriend and their children lived in a unit below Schroeder. Escandon's parents also lived in a separate unit.

On the late night of January 13, 2003, going into the early morning of January 14, Schroeder heard gunshots. At trial, she testified that she looked out her windows but did not see anything.

At trial, after being shown photos of William—one of a tattoo on his chest and the other of him making hand gestures— Schroeder denied knowing that he was an Avenues gang member, knowing that he had gang tattoos, or recognizing his hand gestures as gang signs. She confirmed that Escandon and another man were depicted in one of the photos making the letter A with their hands.

Schroeder denied being afraid of retaliation against herself or her family for testifying at the trial. She acknowledged that in 2016, she was brought in handcuffs to testify at the preliminary hearing for the case. Schroeder recalled speaking to a deputy district attorney who told her that she would need to come to court.

In 2009, Schroeder spoke with Detective Lisa Padilla Sanchez about the incident. She told Detective Padilla Sanchez

7

that when she arrived at her apartment, she saw Escandon and others in the parking lot. Schroeder heard her mother's voice and went outside. She saw her mother, Escandon, and Escandon's parents. Schroeder's mother was trying to calm everyone down and told her to go back inside. When Schroeder returned to her apartment, she heard two shots, a pause, and additional shots. She looked out the window and saw people leaving in cars. After the shooting, Schroeder never had contact with Escandon again.

### 3. Murder of Esteban Real

#### a. Tomas Membrila

On January 22, 2005, at 2:00 or 3:00 p.m., Tomas Membrila arrived at his mother's home next to 4327 Toland Way. He saw three men standing outside. At trial, he testified that later on the way back to his car, he heard shots and ran.

On February 22, 2005, Membrila spoke with Detectives Larry Burcher and Rick Ortiz about the shooting. At trial, Membrila acknowledged that he told the detectives that he saw two of the men firing guns at the third person, who was lying on the ground. Membrila denied telling the detectives that he saw these individuals earlier when he parked his car.

#### b. Griselda Alvarez

On January 22, 2005, Griselda Alvarez was at her apartment at 4337 Toland Way when she heard a shooting at around 7:30 p.m. She saw one young man shoot another young man. The man who got shot fell to the ground. He was shot again while he was on the ground. The man with the gun and another man ran past Alvarez's window. The man with the gun looked at Alvarez. On past occasions, Alvarez would greet the man who got shot. Alvarez called 911.

8

On February 9, 2005, Alvarez met with Detective Burcher. She selected Escandon out of a photographic lineup as the person who had the gun. She wrote, "I think that the hair is like the person that I saw. His skin color is like light tan, slightly tan, tanned. His height and his weight are similar." Alvarez told Detective Burcher that she did not notice anything in the hands of the person who ran by her window, but she also told him that she did not look at the person's hands.

At trial, she testified that she saw Escandon at the preliminary hearing on October 16, 2016. Alvarez testified that he had a gun when she saw him on the date of the shooting in 2005.[2]

### c.  Melissa Chavez

On January 22, 2005, Melissa Chavez was at her home in unit 13 of an apartment building at 4319 Toland Way in Los Angeles. She was with Esteban Real.[3] They were in a dating relationship. Chavez knew Real to be an Avenues gang member with the moniker Demon.[4]

---

[2]  At trial, Alvarez incorrectly identified Efrain Ramirez as the other shooter. She also testified that Efrain Ramirez looked like the person depicted in one of the photographic lineups. However, Ramirez was not charged with the murder of Real.

[3]  Esteban Real shares the same last name with his brothers Nicolas Real, Albert Real, and Francisco Real. To avoid confusion, we refer to Esteban Real as Real.

[4]  Throughout the record, Real is referred to as Demon and Lil Demon.

Chavez received a call for Real on her cellphone. Chavez left the room while Real spoke with the caller. Real got dressed and went outside. Chavez heard what sounded like fireworks five or six times. One of Chavez's family members told her that Real had been shot.

### d. Interviews with Chavez

On January 22, 2005, at 7:15 p.m., Officer Rene Morales received a radio call originating from 4327 Toland Way. He saw Real near the sidewalk and curb area. He saw that Real had sustained multiple gunshot wounds. At the time, Officer Morales was assigned to the Northeast Division gang enforcement detail where he would monitor the Avenues and Highland Park gangs. Officer Morales was familiar with Real and knew his moniker to be "Demon."

Officer Morales met with Chavez who identified herself as Real's girlfriend. Chavez told him that Real received a call on her phone at 6:49 p.m. and went outside after talking on the phone. Chavez further told him that after a few minutes, she heard multiple gunshots. Chavez could not remember the caller's name but recalled that it started with an L.

After midnight on January 23, Detective Burcher spoke with Chavez in her apartment. She told him that Real's behavior had recently been "a little strange." She said that Real was wearing a bulletproof vest and carrying a gun on a regular basis.[5] Chavez told Detective Burcher about the call for Real on her cellphone and that she could only remember the caller's name

---

[5]    At trial, Chavez testified that she never saw Real with a gun and never knew him to wear a bulletproof vest.

10

starting with an L. She also said that after taking the call, Real got dressed and went outside. Minutes later, the shooting occurred.

Chavez showed the phone number of the caller to Detective Burcher. That phone number was 323-220-2125. Detective Burcher obtained records for that number pursuant to a search warrant.

On February 8, 2005, Detective Burcher and Detective Ortiz met with Chavez at the police station. She remembered the name "Lokito" as the caller.

On July 9, 2014, Detective Sanchez Padilla interviewed Chavez. Chavez told her that Real appeared very stressed out before he left the apartment after taking the phone call. Chavez asked Real how much money he would need and gave him a hundred dollars.

### e. Nicolas Real

Nicolas Real was Real's brother. He grew up on Drew Street and had brothers who were Avenues gang members. Everyone called him "Niko."[6] Niko knew Real's moniker was "Lil Demon." His other brother Albert was known as "Baby Demon."[7] At trial, Niko denied being a member of the Avenues. But in 2008 or 2009, Niko served 11 years in prison for a federal racketeering charge related to the Avenues gang.

---

[6] To avoid confusion with Real, we refer to Nicolas Real as Niko.

[7] To avoid confusion with Real, we refer to Albert Real as Albert or Baby Demon.

On the night of the murder, Niko heard that Real was killed and went looking for him at a 7-Eleven. He eventually found Real on the ground on Toland Way.

### f.    Additional investigation

Detective Michael Arteaga became familiar with the Avenues gang when assigned to the gang detail of LAPD's Northeast Division. He knew Real's brothers Niko, Albert, Francisco "Poncho" Real, and Daniel "Clever" Leon.[8] Arteaga opined that each was a member of the Avenues gang.

On March 31, 2005, at 1:40 p.m., when Arteaga was a uniformed officer assigned to the gang unit, he participated in searching a home at 3304 Drew Street, which was a location known for gang and narcotics activity. When he arrived, Arteaga detained Albert for violating a gang injunction. Niko intervened, stating, " 'Come on Arteaga, let him go. You know what's going on.' " Niko continued, " 'You know about Demon. I was talking to Demon when he got killed.' " Niko directed Arteaga to look under a mirror in the living room because he wrote down the phone number of the phone his brother was using when he was shot. Arteaga looked under the mirror and saw "1/22/05," "7:14," and "220-2125." Niko told him that this was the time and date that he wrote down the phone number and added that the phone number was from a "323" area code.

On April 4, 2005, Officer Arteaga wrote a report that included the information provided by Niko. He submitted the report to Detective Burcher. Based on the information in the

---

[8]    To be consistent with the witnesses' references to Daniel "Clever" Leon, we refer to him as Clever.

report, Detectives Burcher and Ortiz contacted Niko at his home on April 13, 2005. Niko informed them that he received a call on the night Real was killed. When he answered the call, Real said his name Niko twice and multiple gunshots were fired. Niko showed the detectives the wall where he had written down the information about the call. Detective Burcher confirmed the information observed by Arteaga: "7:14," "1/22," and "220-2125."

Detective Burcher's investigation of the phone number of 323-220-2125 revealed that the service provider was Nextel and the name of David Martinez was listed as the subscriber. Detective Burcher inquired whether the phone was a "burner phone" or a cell phone that was purchased for a pre-specified number of minutes without the need to subscribe to a service and submit to a credit check. The subscriber named for the phone often did not match the actual user of the phone. Through investigation of phone numbers called from the 2125 cellphone, Detective Burcher confirmed the phone numbers called from the cellphone included those for Niko, Melissa Chavez, Jasmine Villalobos, and Lupe Cullar.[9] Detective Burcher's investigation revealed that Cullar was Escandon's mother. The records indicated that two calls were made to Chavez's cellphone at 6:48 p.m. and 6:49 p.m. on January 22, 2005. At 6:51 p.m., Chavez's home phone number called the 2125 number. The records also showed that at 7:14 p.m., the 2125 number called Niko's cellphone.

An autopsy revealed that Real died from four gunshot wounds to his neck, jaw, chest, and back. Three other shots struck Real's ribcage, lower back, left thigh, and right finger.

---

[9]     The name was also spelled Cueller.

13

Real also sustained nonfatal, superficial injuries from fragments of medium-caliber, copper-jacketed bullets that riddled his body in a manner consistent with bullets striking the concrete ground and deflecting into him as he lay on the sidewalk. Three .45 caliber casings and four 9-millimeter casings were recovered from around Real's body.

### g.    James Campbell

James Campbell was an Avenues member who became an associate of the Mexican Mafia, but he was never a fully validated member. Campbell was convicted of manslaughter in 1994 and imprisoned in Pelican Bay State Prison. While serving his sentence, Campbell requested to be housed next to Richard "Cyco" Aguirre[10] who was a Mexican Mafia member. Cyco Aguirre was also an Avenues gang member.

Cyco Aguirre taught Campbell about Mexican Mafia politics and its tax collecting operation with the Avenues. During this time of 2001 or 2002, the Avenues' tax collecting operation was chaotic and divided with Alex "Pee Wee" Aguirre, Albert

---

[10]    The record refers to multiple persons with the last name Aguirre. For example, Richard "Cyco" Aguirre is the uncle of Richard "Lil Peewee" Aguirre. To avoid confusion and to be consistent with the witness' references to Richard "Cyco" Aguirre, we refer to him as Cyco Aguirre.

"Boxer" Tolento,[11] and Alfred "Tigre" Salinas[12] running their own operations. Boxer specifically collected from the Drew Street area. Campbell testified that Cyco Aguirre became the director of the entire tax collecting operation. He also learned that Tigre was no longer a Mexican Mafia member and was an outcast in the eyes of Cyco Aguirre, Pee Wee Aguirre, and Boxer.

Cyco Aguirre assigned Campbell to implement this new structure on the streets. Campbell was instructed that anyone opposing Cyco Aguirre's tax collecting operation would be given an opportunity to align with him or be eliminated. When Campbell was about to be released from prison in 2004, Cyco Aguirre gave him a "greenlight" list of people to be killed if they opposed the reorganization. This list included Real, Carlos "Lil Wolfie" Cortez, Salinas Jr., and Frank "Kiko" Cordova.

When released, Campbell contacted Carlos "Chopper" Gonzalez[13] who was dating Cyco Aguirre's daughter. Chopper was also operating the tax collecting operation for Cyco Aguirre. A portion of the money collected was being funneled to the Mexican Mafia. Cyco Aguirre further told Campbell to contact his nephew Rudy Aguirre, also known as "Lil Rudy" or "Lil

---

[11]    To be consistent with the witnesses' references, we refer to Albert "Boxer" Tolento as Boxer.

[12]    Alfred "Tigre" Salinas and his son Alfred "Lil Tigre" Salinas Jr. share the same first and last names. To avoid confusion, we refer to the father as Tigre and to the son as Salinas Jr.

[13]    To be consistent with the witnesses' references to Carlos "Chopper" Gonzalez, we refer to him as Chopper.

15

Cyco."[14]  Lil Rudy introduced Campbell to Escandon and Sam "Fox" Vega.  Escandon and Vega were to assist Campbell with the tax collecting in the area for the Avenues gang and dealing with those on the greenlight list, including Salinas Jr., Cordova, and Real.

In 2004, Campbell tried to find Real.  He received information from Chopper and a woman named Ysela "Evil" Castro, who was associated with Boxer.  Specifically, they told Campbell that Real was at his girlfriend's house in Echo Park on a street referred to as Teardrop.  The name of the street is Everett Street and circles a park known as Teardrop Park because it is shaped like a teardrop.  Campbell went to the Teardrop location twice to try to find Real and kill him.

In 2004, Campbell was imprisoned for illegally possessing body armor.  While in custody, Escandon would write letters to Campbell about the tax collecting operation.  Cyco Aguirre terminated Chopper from the operation in the Drew Street area because a large sum of money was not being sent to him.  Cyco Aguirre assigned Campbell to find out what happened to his missing money.

When released from prison in 2006, Campbell met with Lil Rudy, Vega, and Escandon about the tax collecting operation. Campbell was introduced to Neo "Nito" Perez at the meeting.

---

[14]     Cyco Aguirre was the uncle of Rudy Aguirre, who was also known as Lil Cyco or Lil Rudy.  At trial, the prosecutor's exhibit incorrectly referred to Lil Cyco as Richard Aguirre, not Rudy Aguirre.  To avoid confusion and to be consistent with the witness' references to Rudy Aguirre, we refer to him as Rudy Aguirre or Lil Rudy.

16

On June 6, 2006, Campbell arranged to meet with Drew Street members Niko, Clever, and "Nene" about organizing its tax collecting operation. According to Campbell, the Drew Street members were not paying money to the Mexican Mafia from their tax collection. Along with Niko and Clever, Nene was also Real's brother.

According to Campbell, Niko and either Nene or Clever arrived first in one car.[15] They refused to get out of their car, so Campbell removed the keys from the ignition. When they got out of the car, Escandon frisked or put his arm around one of them. Shots were fired from a high-powered rifle from a second car down the street. One shot struck Campbell. Two days later, Campbell met with other Drew Street members and ordered that the Real family pay him $10,000 for the shooting.

Later in June, Campbell, Escandon, and their respective girlfriends were at Dusty's Bar to meet with Rigoberto Perez,.[16] who was an Avenues member. Campbell knew Rigoberto because he grew up on Drew Street. Rigoberto made certain that the Real family would pay the $10,000 and brought the initial payment to Campbell at Dusty's Bar. Campbell and Escandon had also assigned Rigoberto to collect money from the Drew Street area.

At Dusty's Bar, Escandon admitted that he and Neo killed Real. Campbell told Escandon that Cyco Aguirre wanted him

---

[15] Campbell initially testified that Niko and Nene arrived first and Clever shot him. He later testified that Niko and Clever arrived and shots were fired from the car occupied by Nene.

[16] Because Rigoberto Perez shares the same last name as Neo Perez, we refer to each by his first name.

greenlighted because he killed Real in front of his sister's house. Campbell added that he convinced Cyco Aguirre to give Escandon a "pass" because he was simply following the order to kill Real.

During the meeting, Escandon also talked about killing Barajas Jr. Escandon revealed that during a party at his house, he got into an argument with Barajas Jr. Escandon said he shot Barajas Jr. and Salinas Jr. Rigoberto expressed concern about the repercussions of killing Barajas Jr. Escandon moved out of the area because others wanted to kill him in retaliation.

Campbell brought up how he and Chopper later shot and killed Salinas Jr. Campbell revealed that he, Chopper, and Herman Huitron went to speak with Salinas Jr. at his mother's home. They started shooting when they drove up to Salinas Jr.'s car and saw him reach into the backseat. According to Campbell, Escandon was present for the shooting.

Campbell testified that during a Fourth of July party, Escandon again talked about killing Real and Barajas Jr. Escandon held the party at his house in Pico Rivera. He told Campbell that the Real killing did not occur in front of Cyco Aguirre's sister's home. Escandon explained that he intentionally fired away from the home. Escandon further described how he lured Real outside. Chopper called Escandon to inform him that Real was at the apartment building. Escandon said that he originally called Fox to help him kill Real. But Fox refused. Escandon enlisted Neo to help. According to Campbell, Escandon said they were armed with a .45 caliber handgun and a 9-millimeter handgun. Apparently, Real was collecting tax money for Javier "Gangster" Marquez, not Cyco Aguirre. Escandon and Neo called Niko to instruct Real to provide them

with the money collected for Gangster. Escandon said that Niko was the last person to whom Real spoke before he was killed.

In 2008, Campbell was indicted and arrested on federal racketeering charges, along with other Avenues gang members including Escandon and Neo. Campbell met with federal prosecutors and revealed information he had about his involvement with the gang's criminal activity, including the tax collecting operation.

During this time in custody, Escandon sent kites, or handwritten messages, to Campbell. In two kites, written months apart, Escandon again admitted to killing Real, which he referred to as the " 'Teardrop thing.' "[17] Campbell later provided the kites to the federal authorities.

Campbell was ultimately sentenced to seven years on the federal case. The federal government relocated Campbell when he was released in 2014.

### h. Rigoberto Perez

In the late 1980s, Rigoberto was jumped into the Avenues gang when he was 13 or 14 years old. He began selling drugs and gave a percentage of the money from his sales to Cyco Aguirre

---

[17] In one kite, Escandon wrote, "The Teardrop thing, Carlos said to do it, and if not[,] Peewee was going to greenlight us." The kite also stated, "me, Nito and Fox" and "he called [¶] . . . 'you know what you need to do, so do it.' And we did it." Campbell testified that the kite originally named Neo as the person who "did it" with Escandon, but Neo replaced his name with Fox's name. Neo also changed the kite to read that "Rudy," not Fox, was supposed to join Escandon.

In the second kite, Escandon stated, "me and Nito put that to sleep," referring to the Real killing.

who was the Mexican Mafia member in charge of the Avenues gang.

Rigoberto testified that the Avenues gang territory was divided into smaller areas, including the areas of Drew Street and Highland Park. He became a shot caller for the Drew Street area. He also ended up collecting taxes in the Drew Street area. He further testified that he would turn over the money to Escandon, Neo, and Campbell,[18] who would pay him a portion for his service. Rigoberto had frequent meetings with Escandon, Neo, and Campbell to turn over money and discuss what was going on and who owed money. [19]

Rigoberto testified that Escandon personally told him about his involvement in killing Real on at least two occasions: at Dusty's Bar and at a restaurant called La Fuente. The meeting at Dusty's bar occurred a few months after he began providing tax money to Escandon, Neo, and Campbell. During this conversation at Dusty's Bar, Escandon told Rigoberto that he shot Salinas Jr. and Barajas Jr. at his apartment on Arroyo

---

[18]    Rigoberto referred to Campbell by his moniker of Drifter.

[19]    Rigoberto testified that he, Gangster Marquez, and Real, among others, were affiliated with the Drew Street area. He further testified that Escandon, Neo, Campbell, Rudy Aguirre, and a person named Stalker were affiliated with the Highland Park area. According to Detective Castro, Stalker is Sam Salinas. Because Sam Vega and Sam Salinas have the same first name and Sam Salinas, Alfred "Tigre" Salinas, and Alfred Salinas Jr. have the same last name, we refer to Sam Salinas as Stalker.

Drive.  Escandon also told Rigoberto that he and Neo killed Real outside his girlfriend's apartment.  Rigoberto testified that Real was in trouble with the Mexican Mafia because he was collecting tax money for Gangster Marquez who lost his status as a Mexican Mafia member.  During the conversation, Escandon provided additional details about how he made Real believe they were going to collect money from him rather than Gangster Marquez.  When Escandon and Neo met Real, they shot him in the head.  Escandon also told Rigoberto that Vega was supposed to help him kill Real.  But Vega "chickened out," making an excuse that he had to babysit his daughter.  Instead, Neo went with Escandon.  As a result of Neo's participation in the Real murder, he "went up the ranks" and earned tax collecting privileges even though he was not an Avenues member.

During the meeting at La Fuente, Escandon and Neo told Rigoberto again about their involvement in the Real murder.  This time, Escandon also revealed that he knew about Rigoberto committing a murder.

In addition to telling Rigoberto about the Real murder, Escandon also told him about how he was prohibited from collecting in the Drew Street area.  Rigoberto testified about another meeting he had with Escandon, Neo, Rudy Aguirre, and Stalker at his mother's home.  According to Rigoberto, because of the Real murder, members from the Highland Park area controlled by the Avenues could not go into the Drew Street area and collect taxes.  Escandon, Rudy Aguirre, and Campbell told Rigoberto that he would be the shot caller because he was an intermediary between both sides.  Rigoberto testified that he was to collect taxes and forward the money to them.

21

Rigoberto collected taxes for Drew Street until 2007 when he was arrested for a firearm offense. At that point, he wanted out of the gang because he no longer knew whom to trust.

## B. Defense evidence

### 1. William Ramirez

William Ramirez was Escandon's neighbor when he lived at 5745 Arroyo Drive. Ramirez knew Escandon for "maybe a couple years" prior to January 14, 2003. At trial, he testified that he did not know if Escandon was a gang member. Ramirez also denied being an Avenues gang member, even though he admitted to posing in photographs throwing gang signs and had an "L.A." tattoo.

Ramirez testified that he was present at the apartment when the shooting occurred outside. He initially testified that he was "in the parking lot, in front of [his] house" and "everywhere." At about 12:00 p.m. or 1:00 p.m., he was drinking beer with about ten others. Ramirez testified that Escandon "was there probably the entire day before he left." He saw Escandon leave with a man who drove an SUV. Ramirez did not "know where they went, to get more beer, food."

Ramirez was inside arguing with his mother, Sandra Ramirez, when the shooting occurred. He had been arguing inside for four or five minutes when he heard gunfire outside. Ramirez did not see the shooting. He could not see outside because the blinds were closed. He did not see anyone fighting or anyone with a bat chasing people prior to the shooting.

Ramirez went outside after he heard the shooting. When Ramirez walked outside after the shooting, he did not see Escandon. Ramirez's mother and Cuevas came outside after

22

Ramirez had been outside for two to three minutes. Ramirez did not see Escandon point a gun at Cuevas or grab his mother and push her against a wall. He did not see anyone with a gun. He saw Barajas Jr. on the ground. Ramirez knew him as Baby Stretch. After Ramirez went outside, he ran by himself to Arroyo Seco Park which is nearby.

Since January 14, 2003, Escandon called Ramirez collect one time a few years ago, and continued to call him once in "a blue moon."

### 2. Jasmine Villalobos

Jasmine Villalobos was Escandon's girlfriend. She had known him for 24 years. She testified that they have two children. She believed Escandon to be an Avenues gang member.

On January 14, 2003, they had been living at 5745 Arroyo Drive for about six or seven years. Villalobos knew her neighbors Sandra Ramirez and "Ollie."[20] Escandon's parents were neighbors on the other side of Villalobos's apartment with Escandon. Villalobos's sister lived in the unit above. Cassandra Schroeder lived next to Villalobos's sister.

Villalobos was not present during the shooting on January 14, 2003. When she was leaving for work, Escandon was also about to leave to meet a friend named Adan Tejeda.

Villalobos denied ever going to Dusty's Bar with either James Campbell or Rigoberto Perez. When shown the kites to Campbell, which were introduced as prosecution evidence, Villalobos denied that the handwriting was Escandon's.

---

[20] Olivier Cuevas was previously referred to as Ollie. Her name is also spelled Olly in the record.

Villalobos testified that she went to Pelican Bay with Escandon, Neo, and Neo's girlfriend Raquel to meet Cyco Aguirre. According to Villalobos, she met with Cyco Aguirre because Campbell had taxed her $30,000 because Escandon owed him. She wanted to see if Cyco Aguirre could do anything about the taxing. Ultimately, Villalobos gave her car to Campbell.

In October 2016, Villalobos testified at the preliminary hearing that she went to meet with Cyco Aguirre on January 27, 2007. Villalobos testified at the preliminary hearing that she felt that she did not have a choice. Escandon had instructed her to go. He wanted Villalobos to tell Cyco Aguirre that "everything was fine" and "he sends his love."

## II.    Procedure

On November 21, 2019, a jury convicted Escandon of first degree murder of Barajas Jr. (Pen. Code, § 187, subd. (a)[21]; count 1), attempted premeditated murder of Salinas Jr. (§§ 187, subd. (a), 664, subd. (a); count 2), and first degree murder of Real (§ 187, subd. (a); count 4). As to count 1 and count 4, the jury found special circumstances true for multiple murder (§ 190.2, subd. (a)(3)) and gang murder (§ 190.2, subd. (a)(22)). As to counts 1, 2, and 4, the jury found the firearm allegations true for personal use, discharge, and discharge causing great bodily injury or death (§ 12022.53, subds. (b), (c), (d)). The jury also found the gang allegation (§ 186.22, subd. (b)(1)) true for counts 1, 2, and 4. The jury acquitted Escandon of attempted murder of Cuevas (§§ 187, subd. (a), 664, subd. (a); count 3).

---

[21]    All further undesignated statutory references are to the Penal Code.

24

On May 26, 2023, the trial court sentenced Escandon to consecutive terms of life without the possibility of parole for each first degree murder with the special circumstances in count 1 and count 4. The court imposed a consecutive term of seven years to life on the attempted premeditated murder in count 2. On each count, the court imposed an additional term of 25 years to life for the firearm enhancement under section 12022.53, subdivision (d).

## DISCUSSION

### I. Detective Castro's expert interpretation of the recorded calls

Escandon argues that the trial court abused its discretion by admitting recordings of three of his calls with Neo and Detective Arthur Castro's interpretation of the statements they made. We disagree.

#### A. *Detective Castro's expert qualifications*

At trial, LAPD Detective Arthur Castro testified as a gang expert for the prosecution. At the time of the trial, he had been working with LAPD for almost 23 years. He was assigned to LAPD's Northeast Division gang enforcement detail from 2000 to 2007. As a gang officer, Detective Castro would assist detectives with solving crimes, prevent crime during patrol, make arrests, and gather intelligence by speaking with gang members and their family members and members of the community, including homeowners and business owners. He specifically collected intelligence on the Avenues gang.

In November of 2007, Detective Castro participated in a task force which investigated Avenues gang members. He was assigned to an investigation called Operation Black Hand. His role was to assemble the case, gather necessary documents, and

review video recordings. At the same time, Detective Castro also prepared a case for indictment against a Mexican Mafia member named George Bustamante, with whom some Avenues members associated.

In the beginning of 2008, six months to a year after joining the task force, Detective Castro listened to a few thousand recorded calls between Avenues gang members and others. Detective Castro's knowledge of most of the players in the Avenues gang assisted him in reviewing the calls. During this time, active wiretaps recorded calls between Escandon and Neo. Detective Castro became more familiar with them from these calls. He also conducted surveillance of Escandon and Neo.

For six or seven months in 2016, Detective Castro was temporarily assigned to LAPD's Robbery Homicide Division to review nearly 20,000 recorded calls. These calls were connected to Escandon and Neo.

Detective Castro had contacts with other Avenues members who were referenced in the calls, including Stalker, Vega, Rigoberto, Real, Salinas Jr., Barajas Jr.[22], Niko, and William Ramirez. Senior gang officers at the Northeast Division also informed Detective Castro about other Avenues members including Gangster Marquez, Tigre, and Cordova. Detective Castro testified that several of these Avenues members were

---

[22] The prosecutor referred to this person as Barajas with the moniker of Stretch. Because Detective Castro confirmed that this person was killed in 2003, they must have been referring to Frank Barajas, Jr., whose moniker was Lil Stretch, rather than his father Frank Barajas whose moniker was Stretch. Barajas Jr. is the decedent in count 1.

ultimately killed, including Real, Barajas Jr., Cordova, and Salinas Jr.

Detective Castro testified that he interviewed Rigoberto in October 2007.[23] Rigoberto informed him about the political structure of the Avenues gang and its affiliation with the Mexican Mafia.

During Detective Castro's review of the calls, he learned about the tax collecting operation of the Avenues. He testified that Escandon was part of the tax collecting operation specifically associated with Cyco Aguirre, who was a member of the Avenues and the Mexican Mafia. Detective Castro learned that Rigoberto, Stalker, Vega, and a person named Herman Huitron were also involved in tax collection for the Avenues gang.

Detective Castro also reviewed video and audio recorded visits at Pelican Bay state prison, where most of the "shot callers" for the Mexican Mafia were imprisoned. These included visits to Cyco Aguirre.

### B.    The calls

The prosecutor played three calls between Escandon and Neo for the jury and elicited testimony from Detective Castro about them. The calls were placed by Escandon on October 4, 2007, January 18, 2007, and February 26, 2007.

### 1.    The call from October 4, 2007

During the jail call from October 4, 2007, Escandon and Neo referred to a man as "Fireball." Detective Castro testified

---

[23]    Detective Castro originally testified that the interview with Rigoberto was in October 2000 but then stated it was October 2007.

27

that he had heard the name Fireball in other calls between Escandon and Neo and others. Based on the references in these other calls, he identified Fireball as Vega. Prior to testifying about the jail call, Detective Castro mentioned that he previously had contact with Vega and knew him to be an Avenues member with the moniker of Fox.

In the October 4, 2007 call, Neo stated that according to "Bad Boy," Stalker was with Fireball at the Glendale Galleria, even though he was instructed not to associate with him. Detective Castro knew Stalker to be an Avenues member named Sam Salinas. Detective Castro identified Bad Boy as Gonzalo Pineda, a shot caller for the Assassins clique of the Avenues gang. According to Detective Castro, Bad Boy had a girlfriend who worked at the Glendale Galleria. Bad Boy's girlfriend called him from the Glendale Galleria, and he spoke to Stalker and Fireball, confirming they were together. At multiple points during the call, Neo recounted the conversation that Bad Boy had with Fireball. When asked about Escandon and Neo, Fireball said he no longer talked to either. Neo told Escandon that he later talked to Stalker and confronted him about being with Fireball.[24]

During the call, Neo described a tattoo of "Melissa" on the head of the man who went to the Glendale Galleria. Detective Castro testified that he knew Vega's girlfriend to be named Melissa, corroborating Fireball was Vega.

---

[24] When Neo discussed Bad Boy's conversation with Fireball, he referred to "Locs" and "Nito." Detective Castro testified that "Locs" is short for "Lokito," which is Escandon's moniker. "Nito" is Neo.

28

Neo also told Escandon that Fireball said, "fuck the construction." Detective Castro explained that the Mexican Mafia members and their associates used code words. The term "construction" referred to the Avenues gang's tax collecting operation. Neo described how Fireball was not aligned with the Avenues tax collecting operation led by Cyco Aguirre. According to Detective Castro, Neo also criticized Fireball for spending time with his girlfriend instead of participating in their tax collecting operation.

Detective Castro testified that Escandon and Vega were arrested on March 23, 2005 for the Real murder. According to Detective Castro, later in the call, Neo mocked Fireball for complaining about time he spent in custody for the Real murder. During this portion of the call, Escandon also told Neo, "Fireball's going to be back here." Detective Castro testified that Escandon was telling Neo that Fireball would eventually return to working in their tax collecting operation under Cyco Aguirre's faction of the Mexican Mafia.

During the call, Escandon and Neo also referred to a person known as "White Boy." Detective Castro testified that "White Boy" was Campbell. He knew Campbell to be an Avenues member who was Caucasian.

### 2.     The call from January 18, 2007[25]

During a call intercepted by a wiretap on January 18, 2007, Escandon and Neo discussed a person they referred to as "Cock Nose" or "Cock Breath," who was involved in the tax collecting

---

[25]     Both counsel stipulated that the call was from January 18, 2007.

29

operation under Cyco Aguirre. Detective Castro testified that this person was Herman Huitron.[26] During the call, Escandon stated that Huitron suffered a "pay deduction" by Chopper, who Detective Castro identified as Carlos Gonzalez. Chopper also participated in the tax collecting operation. According to Detective Castro, Escandon and Neo talked about how Huitron did not collect all the tax collection money owed to the Avenues gang as ordered.

Detective Castro testified that Chopper lived on Toland Way and dated a member of the Aguirre family who lived at the address next to where Real was killed.[27] Detective Castro testified that Escandon and Neo used the term "Teardrop" to refer to Real's murder.[28] Detective Castro testified that Real

---

[26] According to Detective Castro, in other calls, Escandon and Neo had referred to him as "Mouth" and "Yuckmouth," and described him as having bad breath.

[27] According to Campbell, Chopper was dating the daughter of Cyco Aguirre's sister, and he was working for Cyco Aguirre.

[28] In the call on January 18, 2007, Escandon recounted, "I don't know, but he was sad, dog. I'm sad, dog. Teardrop. I'm sad." The record is unclear whether Escandon's use of the term "teardrop" during this part of the conversation referred to Huitron's grief over his brother's death or the Real murder, as suggested by Detective Castro. Earlier in the conversation, Escandon and Neo were talking about Huitron lamenting over the death of his brother. Neo first mentioned Huitron's brother's death when he stated, "He—that fool—hey, remember that one time, 'That was my brother, ah.' And they were clocking that fool? It was like the same day his fucken brother died, fool." Escandon later added, "Remember, fucken, Chops, fool, he fucken was gonna give him a pay deduction because he didn't go,

lived on Everett Street, north of Sunset. He also testified that Neo and Escandon referred to the Real murder as Teardrop in other calls.

### 3. The call from February 26, 2007

Detective Castro testified that during the call from February 26, 2007, Escandon told Neo about a conversation he had with Vega. According to Detective Castro, Escandon discussed with Neo how he had told Vega about an Avenues member named "Creeper" who did not get along with Rigoberto. Both Creeper and Rigoberto participated in the tax collecting operation. Escandon appeared to have described how Vega complained about Creeper and contrasted him to Neo, who was not even an Avenues member,[29] but still supported Cyco Aguirre. Detective Castro explained that members from gangs outside of the area would frequently join a Mexican Mafia tax collecting operation.

Detective Castro testified that in the call, Neo and Escandon paid homage to Cyco Aguirre, while complaining about Vega. Specifically, they complained about Vega's commitment to his girlfriend over the tax collecting operation.

Detective Castro testified that Neo also discussed the Real murder. Specifically, Neo stated, "Teardrop, dog," and recounted

because it was his brother's funeral or something?" Neo also noted, "It's almost the fucken anniversary, huh?" Detective Castro agreed that they were talking about Huitron and his brother. Detective Castro did not know who Huitron's brother was. The record is unclear whether Huitron was referring to a biological brother or a close friend.

[29]    Neo was a member of the Compton Tortilla Flats gang.

how he was with his family when Escandon called him "to come do that" and he left his family "to go do it." Neo further stated that everybody was busy so he "handled it." According to Detective Castro, Neo was "representing Cyco Aguirre on the street and showing his loyalty by answering the call, so to speak, and going and handling business," even though he was not a member of the Avenues gang. Detective Castro further testified that Neo complained that he and Escandon did not get anything from killing Real. Detective Castro testified that Neo was upset that he did not get credit from members of Cyco Aguirre's faction for helping Escandon in murdering Real, and Escandon got arrested.

### C. *Trial court's gatekeeping of Detective Castro's opinions*

In Escandon's challenge to the admission of the three calls, he highlights three of Detective Castro's opinions of statements made by Escandon and Neo. First, Detective Castro identified Fireball as Vega. Second, he determined that the term "Teardrop" referred to the Real murder. Third, he understood Neo's story about answering Escandon's call as joining Escandon in killing Real. Escandon asserts that the trial court should have excluded Detective Castro's interpretations of these statements as a part of its " 'gatekeeping' responsibility" under *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 769 (*Sargon*).

"The trial court has broad discretion in deciding whether to admit or exclude expert testimony." (*People v. McDowell* (2012) 54 Cal.4th 395, 426; *People v. Corbi* (2024) 106 Cal.App.5th 25, 35.) We review the trial court's admission of evidence, including expert opinion evidence, for abuse of discretion. (*People v.*

32

*Alvarez* (1996) 14 Cal.4th 155, 201; *People v. Caitlin* (2001) 26 Cal.4th 81, 131.)  The trial court's admission of evidence is an abuse of discretion if it is " 'so irrational or arbitrary that no reasonable person could agree with it.' " (*Sargon, supra*, 55 Cal.4th at p. 773.)

In *Sargon*, the Supreme Court charged trial courts with a gatekeeping duty to exclude expert opinion testimony "that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative." [30] (*Sargon, supra*, 55 Cal.4th at pp. 771–772.)

At the outset, we cannot summarily discount Detective Castro's experience and the matter on which he relied.  He was a

---

[30]     In fashioning these factors, the Supreme Court drew from Evidence Code section 801 which limits expert opinion to an opinion that "is:  [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."  The Court determined that "under Evidence Code section 801, the trial court acts as a gatekeeper to exclude speculative or irrelevant expert opinion." (*Sargon, supra*, 55 Cal.4th at p. 770.)  *Sargon* also considered "Evidence Code section 802, [which] provides:  'A witness testifying in the form of an opinion may state . . . the *reasons* for his opinion and the matter . . . upon which it is based." (*Id.*, at p. 771.)  "Evidence Code section 801 governs judicial review of the *type* of matter; Evidence Code section 802 governs judicial review of the *reasons* for the opinion." (*Ibid.*)

23-year veteran police officer, specifically monitoring the Avenues gang while assigned to the gang enforcement detail. Significantly, he reviewed nearly 20,000 calls generated by its members, including Escandon. Detective Castro also had personal contacts with many of them, again, including Escandon. Additionally, he reviewed recordings of prison visits to Cyco Aguirre and other Mexican Mafia members. Detective Castro's "special knowledge and experience" about the Avenues gang and its members' conversations with one another provided a sufficient basis under Evidence Code section 801, subdivision (b) to interpret the calls, including the three challenged portions. Any gang expert would reasonably rely on such recorded calls between gang members to form opinions about references they made and terms they used as code for gang activity.

The trial court fulfilled its gatekeeping duty under *Sargon*. It did not admit every opinion formed by Detective Castro that he generically based on his review of the recorded calls alone. For example, the trial court struck Detective Castro's testimony that in the first call, Neo was referring to the Real murder when he stated, "[I]t's already been a known fact from before, homie. And you know what I'm talking about." The court reasoned, "I know he's an expert. He's allowed to tell us what gang slang means. He's allowed to offer an opinion. But he's not allowed to make straw into gold, meaning he's not allowed to take three lines that are completely incomprehensible and say they mean this . . . because I listened to 20,000 other conversations. That he can't do." The court demonstrated its understanding of *Sargon*'s reference to an unacceptable " 'analytical gap between the data and the opinion proffered.' [Citation.]" (*Sargon, supra*, 55 Cal.4th at p. 771.)

This example of speculative opinion testimony starkly contrasts with Detective Castro's opinion that Escandon and Neo interchangeably used the nicknames of Fireball and Fox for Vega. Other portions of the admitted calls supported this opinion, as Detective Castro testified.

First, in the October 4, 2007 call, Escandon and Neo referred to the story about Fireball spending time with his girlfriend instead of fulfilling his gang duties. In the February 26, 2007 call, they described how Fox did the same.

Second, in the October 4, 2007 call, Neo recounted how Fireball complained about spending time in custody. According to Detective Castro, Fireball's time in custody aligned with the time that Vega and Escandon spent in custody for the Real murder.[31]

Third, in the October 4, 2007 call, Neo told a story about Stalker's critical association with Fireball at the Glendale Galleria. In the February 26, 2007 call, Escandon described how he questioned Fox about Stalker, and Fox denounced any association with him. Fox's distancing himself from Stalker was consistent with the story mentioned in the first call.

Fourth, during the October 4, 2007 call, Neo described a tattoo of "Melissa" on Fireball's head when he discussed the story of Fireball and Stalker going to the Glendale Galleria. Detective Castro testified that he knew Vega's girlfriend to be named

---

[31] The parties stipulated that on March 25, 2005, the Los Angeles County District Attorney filed one count of murder against Escandon and Vega for killing Real and announced the prosecution would not proceed on August 9, 2005.

Melissa. The totality of these references supported Detective Castro's opinion that Fireball and Fox both referred to Vega.

Portions of the February 26, 2007 call also reasonably allowed Detective Castro to opine that Neo referred to killing Real with Escandon in his story about Escandon calling him. As we stated earlier, during the call, Neo complained about how he did not receive credit for participating in the killing when Fox declined to participate. Additionally, Neo used the term "Teardrop" during this call, after he and Escandon used the term in the January 18, 2007 call. From the context of Neo's reference to Teardrop, Detective Castro opined that it referred to the Real murder. Because other portions of the admitted calls supported Detective Castro's opinions about the name Fireball, the term Teardrop, and Neo's story of answering Escandon's call, we conclude that the trial court acted within its discretion in determining they were not unsupported nor based on improper speculation.

### D.    *Relevance of the calls*

Escandon further appears to argue that had the trial court excluded Detective Castro's interpretations, the calls would have been irrelevant because they "could not be understood to have anything to do with the charged offenses." We reject Escandon's contention. Because we conclude that adequate foundation supported Detective Castro's expert testimony, we further conclude the calls were relevant in that they implicated Escandon in the Real murder.

The October 4, 2007 call revealed Escandon's and Neo's loyalty to Cyco Aguirre, who ordered the killing of Real for improperly funneling his tax collection money to Gangster Marquez. This call also included Escandon's and Neo's

36

involvement in Cyco Aguirre's tax collecting operation and knowledge of Campbell, who ultimately communicated the order to kill Real. In the January 18, 2007 call, Escandon and Neo used the term Teardrop, which was code for the Real murder. The February 26, 2007 call included Neo's and Escandon's complaints about Vega declining to participate in the Real murder. The trial court did not abuse its discretion in admitting these calls as relevant to establish Escandon's identity as one of the participants in the Real murder, and his motive and intent to kill Real by following Cyco Aguirre's order. (*People v. Heard* (2003) 31 Cal.4th 946, 973.)

### E. *Any assumed error was harmless*

Even if we assume that the trial court erroneously admitted the calls and Detective Castro's interpretations, we conclude any error was harmless under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) and *People v. Prieto* (2003) 30 Cal.4th 226, 247. Under the *Watson* standard, we must reverse when it is reasonably probable that the jury would have reached a result more favorable to Escandon absent the error. (*Watson,* at p. 836.) Even if the trial court excluded the entirety of the three calls and Detective Castro had not opined on the three challenged portions or any other portion that was admitted, we cannot conclude that it is reasonably probable that Escandon would have achieved a more favorable outcome in this case.

First, the jury did not blindly adopt Detective Castro's opinions. The trial court instructed the jury that it was "not bound by" any expert opinion, must give each opinion the weight it deserves, and was free to disregard any unreasonable opinion. (CALJIC No. 2.80.) We presume the jury understood and

37

followed this instruction. (*People v. McKinnon* (2011) 52 Cal.4th 610, 670 (*McKinnon*).) Nothing rebuts this presumption. Second, other evidence confirmed Detective Castro's interpretations of the portions of the calls. Rigoberto and Campbell testified that while at Dusty's Bar, Escandon told them that Neo helped him kill Real and further confirmed that Vega declined when asked to participate in the killing. Campbell testified that Real lived on a street known as Teardrop because it circled around a park in the shape of a teardrop. The Real murder reasonably adopted the Teardrop name from the street's nickname. Campbell also testified about kites from Escandon that included his admission to killing Real and references to the murder as Teardrop.

Third, overwhelming evidence established Escandon's guilt for the Real murder.[32] In addition to Escandon's admission to Rigoberto and Campbell at Dusty's Bar and his kites to Campbell while in custody, he also admitted to Campbell at a Fourth of July party. Escandon included details of how he tried to avoid shooting at the Aguirre family's home when he shot Real, and after Vega declined to help, he and Neo obtained .45 caliber and 9-millimeter handguns. The police found casings in the same calibers near Real's body.

---

[32] We further reject Escandon's assertion that the jury "felt this was a close case" based on the eight days of the jury's deliberations. The jury deliberated eight days for the entire case, which included consideration of the Real murder, the Barajas Jr. murder, the attempted murder of Salinas Jr., the attempted murder of Cuevas, and the multiple enhancements, allegations, and special circumstances. The jury never indicated that it was deadlocked on Escandon's guilt for the Real murder.

Escandon argues that Campbell and Rigoberto lacked credibility because they had an incentive to testify favorably for the District Attorney to obtain leniency with other prosecutions.[33] But each was also "marked for death" by their gang for cooperating with law enforcement. The jury could have found them more credible because of this harsher consequence for testifying. Their credibility was bolstered by corroborating evidence, such as Real identifying the caller with Escandon's moniker Lokito, the eyewitness identification of Escandon as the shooter by Griselda Alvarez, and the two different calibers of casings found at the scene as matching the calibers of firearms about which Escandon told Campbell.

### F.    *No due process violation*

Escandon further asserts that the admission of the calls and Detective Castro's interpretation of them violated his federal constitutional right to due process. The admission of evidence in violation of California law will only be found to violate due process if the error rendered a defendant's trial fundamentally unfair. (*People v. Merriman* (2014) 60 Cal.4th 1, 70.) We cannot conclude that admitting the calls and Detective Castro's interpretation of them rendered Escandon's trial fundamentally unfair because the same information was admitted through other sources, as we discussed.[34]

---

[33]    Campbell was indicted on federal racketeering charges and ultimately cooperated with the federal prosecutors. Rigoberto testified under a grant of immunity and acknowledged that he had not been prosecuted for a murder he committed.

[34]    We also reject Escandon's conclusory argument that Detective Castro implied there was "incriminating extrajudicial

39

## II. Statements introduced through Rigoberto Perez and James Campbell

Escandon argues that the trial court abused its discretion by admitting statements from the testimony of Rigoberto and Campbell that implicated him in the Real murder. Specifically, he challenges the admission of Rigoberto's testimony that Escandon and Neo did not directly control the Drew Street territory "[b]ecause they had killed [Real]." He also challenges Campbell's testimony about statements made by Cyco Aguirre. Escandon reasons that no foundation was laid for either statement, and both statements were irrelevant to any issue in the case. He additionally asserts that one layer of statements in Campbell's testimony was inadmissible hearsay. We reject Escandon's arguments.

### A. *Admissibility of the statements to Rigoberto*

Escandon challenges the admission of Rigoberto's testimony that he turned over money to Escandon and Neo because they were not in control of Drew Street as a result of killing Real. He asserts Rigoberto did not have the requisite personal knowledge to testify to this statement. Escandon suggests that Rigoberto must have learned the information from an unidentified third-party source. Escandon is wrong.

Rigoberto's testimony directly refutes Escandon's suggestion on appeal that an unidentified third party provided the information for the challenged statement. Escandon, not an

___

evidence" in the calls that violated his Sixth Amendment rights to confrontation and to a jury trial because portions of the admitted calls supported his interpretations.

unidentified third party, provided Rigoberto with the requisite personal knowledge that the reason for funneling tax-collected money to Escandon and the others was because they were not in control of Drew Street as a result of killing Real. (Evid. Code, § 702, subd. (a); *People v. Cortez* (2016) 63 Cal.4th 101, 123 (*Cortez*).) A rational trier of fact could find that Rigoberto accurately perceived and recollected his conversation with Escandon who told him about the requisite information. (*Cortez,* at p. 124; *People v. Flinner* (2020) 10 Cal.5th 686, 741 (*Flinner*).) It was up to " ' "the jury to decide whether [Rigoberto's] perceptions and recollections [were] credible." ' [Citation.]" (*People v. Johnson* (2018) 6 Cal.5th 541, 583.) We conclude that the trial court did not abuse its discretion in admitting this portion of Rigoberto's testimony because he had the requisite personal knowledge from Escandon's admissions. (*People v. Lucas* (1995) 12 Cal.4th 415, 466 ["[t]he decision whether the foundational evidence is sufficiently substantial is a matter within the court's discretion"].)

The trial court admitted the statement from Rigoberto's testimony as non-hearsay to explain "why [Rigoberto] does certain things and his relationship with [Escandon] and [Neo]."[35] Without sufficient elaboration, Escandon also argues that the statement was "not relevant to explain why Rigoberto gave the

---

[35] After overruling an objection by defense counsel, the trial court told the jury, "I am going to, over the objection, allow it in, but it's not for the truth of the matter. And obviously that's, you know, one of the things you're going to decide in this case. So clearly it's not for the truth of the matter, but it's to explain why he does certain things and his relationship with [Escandon] and [Neo.]"

taxes he collected to [him]," nor was it relevant to "shed any light on" their relationship. We reject Escandon's arguments.

At the outset, since Escandon made the statement, it qualifies as a party admission, which is an exception to the hearsay rule that would allow its admissibility for the truth of the matter asserted. (Evid. Code, § 1220.)

The non-hearsay purpose of the statement was to explain why Rigoberto "funneled 'thousands of dollars' in Drew Street taxes to [Escandon] on behalf of the Mexican Mafia." Because Escandon and Neo killed Real, who was a Drew Street member, they were prohibited from collecting taxes from the Drew Street area. Because of this prohibition against Escandon and Neo, they had to use Rigoberto to collect the tax money for them.

In Escandon's reply brief, he elaborates that Rigoberto's testimony was offered to prove the truth of the assertion that Escandon "could not collect taxes [from] Drew Street because he killed Real." Escandon appears to further argue that if this is the relevance of the statement, then the statement is inadmissible hearsay. Escandon states that the Attorney General asserts that the relevance of the statement was to "prove *why* Escandon could no longer collect taxes." But he oversimplifies the Attorney General's assertion.

In his brief, the Attorney General states, "Rigoberto's statement explained why, despite this status, appellant could not collect directly from Drew Street and why Rigoberto became the Drew Street shot caller who funneled 'thousands of dollars' in Drew Street taxes to [Escandon] on behalf of the Mexican Mafia." The statement contained information about the prohibition of Escandon collecting taxes from Drew Street and the reason for the prohibition. This statement prompted Rigoberto to accept the

role of shot caller for Drew Street and funnel the tax money to Escandon. The statement was relevant to show why Rigoberto gave the tax money to Escandon and Neo, as opposed to Escandon personally collecting it. Escandon focuses only on the latter portion. We conclude the statement supported the non-hearsay purpose of the effect on Rigoberto as the listener and to explain his subsequent conduct. (Evid. Code, § 1250; *People v. Clark* (2016) 63 Cal.4th 522, 562.)

The trial court did not abuse its discretion in admitting the challenged portion of Rigoberto's testimony. (*Flinner*, *supra*, 10 Cal.5th at p. 740; *People v. Cowan* (2010) 50 Cal.4th 401, 483; *People v. Waidla* (2000) 22 Cal.4th 690, 725.)

### B.    *Admissibility of Campbell's testimony about Cyco Aguirre wanting to kill Escandon*

Escandon challenges the admission of Campbell's testimony that Cyco Aguirre told him that he wanted to kill Escandon for shooting Real in front of his sister's home.[36] Escandon argues that the statements were inadmissible because Cyco Aguirre had no personal knowledge of Real's murder and his statements to Campbell were hearsay.

---

[36]    Campbell testified, "Lokito at the time was bringing up the fact that he killed Lil Demon. Him and Nito killed Lil Demon. They were—at the that time there was concern that Cyco wanted him greenlighted because he killed him in front of his sister's house, and I had this conversation personally with Cyco about him ordering Lokito killed for doing that, and I mean I just—how are you going to kill someone for doing what you want them to do in the first place. So at that time he let Lokito have a pass."

43

The trial court admonished the jury that Cyco Aguirre's statements were not offered for their truth "because obviously that person making [those statements] was not present when anything happened along those lines, but [they] came in for the impact the words had on this person who is being told that information, and the subsequent conversations that occurred as a result of that."

Escandon argues that Campbell's testimony "lacked foundation because it was not established how Campbell knew that Aguirre obtained [the] news [of Escandon committing the Real murder]." Escandon is unclear about whether he is challenging how *Campbell* knew Cyco Aguirre obtained the news or how *Cyco Aguirre* obtained the news. Campbell testified that he knew that Cyco Aguirre obtained the news about Escandon committing the murder because Cyco Aguirre told him. But the record does not indicate how Cyco Aguirre obtained the news.

The personal knowledge requirement extends to statements of hearsay declarants. (*Cortez*, *supra*, 63 Cal.4th at pp. 123–124.) Escandon relies on the rule that the proponent of a hearsay statement must show that the hearsay declarant has personal knowledge of his statement when it is admitted for its truth. (*People v. Valencia* (2006) 146 Cal.App.4th 92, 103–104 [inadmissible testimony about a statement by a declarant offered for its truth that defendant molested her for more than three months to prove element of continuous sexual abuse]; *Cortez*, at pp. 123–124 [ample evidence from which a rational trier of fact could conclude hearsay declarant had personal knowledge of the admissible hearsay statements suggesting defendant knew of and went along with a plan to commit a shooting].)

44

We can dismiss Escandon's challenge because the statement was not admitted for its truth. Cyco Aguirre's statement was admitted as non-hearsay to explain its effect on Campbell and on Escandon. Campbell first testified about hearing the statement from Cyco Aguirre to explain why Escandon told him about the Real murder. Campbell then testified that he later told Escandon about Cyco Aguirre's statement to mitigate his concern about being executed. Campbell had personal knowledge that Cyco Aguirre made the statement because it was made during a conversation between the two. The trial court did not abuse its discretion in determining the statement was relevant, non-hearsay, and supported by sufficient foundation.

### C.    *Any assumed error was harmless*

Even assuming the trial court erred in admitting the statements through Rigoberto's or Campbell's testimony, any error was harmless under any standard.[37] (*Chapman v. California* (1967) 386 U.S. 18, 24 [reversal required under federal standard if the prosecution cannot show beyond a reasonable doubt that the error did not contribute to the verdict]; *Watson*, *supra*, 46 Cal.2d at p. 836 [requiring reversal only if the defendant can show it is reasonably probable the jury would have reached a different result but for the error].)

---

[37]    "[G]enerally, violations of state evidentiary rules do not rise to the level of federal constitutional error." (*People v. Benavides* (2005) 35 Cal.4th 69, 91.) Any error did not violate the Due Process Clause of the Fourteenth Amendment or otherwise result in an unfair trial.

As stated, overwhelming evidence implicated Escandon in the Real murder, including his admissions to both Rigoberto and Campbell. Additionally, after each witness testified to the respective challenged statement, the trial court admonished the jury to not consider it for its truth, but for non-hearsay purposes. The trial court also instructed the jury to consider the testimony only for its admitted purposes (CALJIC No. 2.09) and to assess the credibility of the witnesses based on their ability to perceive the subject matter of their testimony (CALJIC No. 2.81). No evidence rebuts the presumption that the jury followed the court's instructions. (*McKinnon, supra,* 52 Cal.4th at p. 670.)

## III.    Instruction on alibi

Escandon argues that the trial court should have read the instruction on alibi (CALJIC No. 4.50) because there was substantial evidence that he was not present during the shootings of Barajas Jr. and Salinas Jr.

### A.    *Additional facts*

The defense called William Ramirez as a witness. He testified that he was Escandon's neighbor at the Arroyo Drive apartment when Barajas Jr. and Salinas Jr. were shot. He was inside his unit when he heard shots fired. When Ramirez went outside, he did not see Escandon.

After Ramirez testified, the trial court said it would consider reading an alibi instruction to the jury. Escandon's counsel confirmed that he was requesting the instruction. The court ultimately concluded that substantial evidence did not support an alibi. The court highlighted that the evidence did not establish when Ramirez was present to observe the shooting or who fired the shots. Specifically, the court stated, "He's at least

46

not there at least five or more minutes before the murder, he's not there at least five minutes after the murder, he's not there during the murder itself." The court added that Ramirez was unclear about when Escandon left the scene. Ramirez testified that he was with Escandon all afternoon. But Ramirez did not provide any time frame as to when he left. Ramirez did not say where he went nor what he did when he left.

### B. *No substantial evidence to instruct on alibi*

Escandon argues that the trial court erred in refusing to instruct the jury on alibi based on William Ramirez's testimony that he did not see Escandon outside after the shots were fired. Escandon elaborates that the instruction would have informed the jurors that the defense introduced evidence to show he was not present at the time and place of the commission of the offenses, and they should acquit if they had a reasonable doubt that he was present when the offenses were committed. (CALJIC No. 4.50.) We reject Escandon's argument.

An alibi is not an affirmative defense. (*People v. Bradley* (1945) 71 Cal.App.2d 114, 119 (*Bradley*).) It merely disputes " 'that the defendant was personally present at the place when the offense was committed.' " (*Ibid*.) It "cannot be considered by itself, but must be considered in connection with all other evidence in the case." (*People v. Branch* (1962) 205 Cal.App.2d 688, 691.) When " 'instructions relate particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case, such as mistaken identification or alibi[,] . . . [t]hey are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte.' " (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824.) The trial court should give a pinpoint instruction on a defense theory if it is

47

supported by substantial evidence. (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1174.) Substantial evidence means evidence that is sufficient to "deserve jury consideration." (*People v. Marshall* (1997) 15 Cal.4th 1, 39.) It is " ' "not 'whenever *any* evidence is presented, no matter how weak.' " ' [Citations.]" (*People v. Wilson* (2005) 36 Cal.4th 309, 331.)

Although Ramirez did not see Escandon after the shots were fired, no evidence supported him being somewhere other than the location of the shooting at the time the shots were fired. (*Bradley*, *supra*, 71 Cal.App.2d at p. 119.) Ramirez did not witness the shooting. He was inside and could not see outside because the blinds were down. He only went outside after the shots were fired.

Even if the trial court denied a request to read the alibi instruction and substantial evidence supported it, Escandon did not suffer prejudice because the jury was generally instructed to consider all the evidence and to acquit if the prosecution failed to prove guilt beyond a burden of proof. (*People v. Freeman* (1978) 22 Cal.3d 434, 438; *People v. Alcala* (1992) 4 Cal.4th 742, 804.) The jury presumably considered these instructions—provided in CALJIC Nos. 2.90 and 2.91—to ultimately reject any theory of alibi and convict Escandon.

## IV.  No cumulative error

Escandon argues that the cumulative effect of the purported errors deprived him of a fair trial and due process. The aggregate prejudice from multiple errors could require reversal even if no single error was itself prejudicial. (*People v. Hill* (1998) 17 Cal.4th 800, 844.) Under the cumulative error doctrine, we must review each challenge and evaluate the cumulative effect of any errors to determine if it is reasonably

48

probable the jury would have reached a more favorable result in their absence. (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.) But here, we have rejected every claim of error raised by Escandon. We have merely concluded that any assumed error was not prejudicial. We reach the same conclusion after considering the assumed errors' cumulative effect. (*Ibid.*; *People v. Booker* (2011) 51 Cal.4th 141, 195.) There was no miscarriage of justice and Escandon was not denied a fair trial or deprived of due process. (*Hill*, at pp. 844–845.)

## V. Gang murder special circumstance and gang enhancement

### A. *Sufficiency of the evidence for the gang murder special circumstance and gang enhancement as to the Barajas Jr. murder*

Escandon argues that insufficient evidence supported the gang murder special circumstance under section 190.2, subdivision (a)(22) and the gang enhancement under section 186.22, subdivision (b), both as applied to the murder of Barajas Jr. in count 1.[38] The Attorney General concedes that they must both be reversed and double jeopardy bars retrial. We agree with Escandon and accept the Attorney General's concession.

Section 186.22, subdivision (b) provides a sentencing enhancement or an alternate penalty for the commission of a felony "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." In

---

[38] Escandon incorrectly refers to count 4 as involving the murder of Barajas Jr., which was the offense in count 1.

simple terms, the enhancement requires "gang-related" conduct that was "committed to promote the criminal activity of gang members." (*People v. Renteria* (2022) 13 Cal.5th 951, 963 (*Renteria*).)

The gang murder special circumstance requires that the defendant intentionally killed a victim, while an active participant in a gang, to "further the activities" of the gang. [39] (§ 190.2, subd. (a)(22).) Furthering the activities of the gang "substantially parallels" the requirements of the gang enhancement under section 186.22, subdivision (b). (*People v. Carr* (2010) 190 Cal.App.4th 475, 488.)

The Attorney General observes that the record lacked specific evidence about why Escandon killed Barajas Jr. Although the record established that both Escandon and Barajas Jr. were Avenues gang members, it did not reveal anything about the circumstances surrounding the killing other than occurring after a verbal argument.

The prosecutor's closing argument shed minimal light on the circumstances surrounding the Barajas Jr. murder. The prosecutor vaguely asserted that Escandon murdered Barajas Jr. "because there was an argument . . . ." In rebuttal argument, the prosecutor admitted, "And when we think about Frank Barajas[, Jr.], who we know nothing about really, other than being an Avenues gang member and hanging out with Escandon, the defendant, in 2003, there's a fight that breaks

---

[39] The activities to be furthered are those that constitute the gang's pattern of criminal activity described in section 186.22, subdivision (e), which includes the commission of two or more of the 33 enumerated felonies. (*People v. Arce* (2020) 47 Cal.App.5th 700, 712–714.)

out . . . [Escandon] walks into his house, pulls out a gun, makes sure it's loaded, comes out and shoots Frank Barajas[, Jr.] in the back and kills him . . . ."

When discussing the gang enhancements in closing argument, the prosecutor described how Escandon was elevating his status as a gang member by killing for the Avenues and Mexican Mafia, as well as publicizing the violent reputation of both gangs by showing that they "clean . . . house by killing [their] own members." When arguing about the gang special circumstance, the prosecutor repeated, "Was the murder carried out to benefit the activities of the criminal street gang? Absolutely. It's to clean house, so that they are now a more effective operation." But the prosecutor did not refer to any evidence that would tie this "cleaning house" motive or any other gang-related motive to killing Barajas Jr.

Even " 'in the light most favorable to the judgment below,' " the record does not disclose substantial evidence for a reasonable trier of fact to find the special circumstance allegation or sentencing provision true beyond a reasonable doubt. (*People v. Boyce* (2014) 59 Cal.4th 672, 691; *People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).) We conclude that insufficient evidence supported the element of the special circumstance that Escandon murdered Barajas Jr. "to further the activities" of the gang, as required under section 190.2, subdivision (a)(22). Similarly, nothing supported Escandon killing Barajas Jr. for the "benefit of, at the direction of, or in association with" a gang, as required under section 186.22, subdivision (b).[40] Our conclusion regarding

---

[40] The Attorney General asserts that there was no evidence that Escandon murdered Barajas Jr. with the requisite specific intent for the gang enhancement. However, neither the Attorney

the insufficiency of the evidence requires us to reverse both the special circumstance and the enhancement for count 1. (*People v. Hin* (2025) 17 Cal.5th 401, 468 (*Hin*).)

The double jeopardy clause of the federal constitution's fifth amendment provides that no person may "be subject for the same offense to be twice put in jeopardy of life or limb." The state constitution provides the same protection. (Cal. Const., art. I, § 15.) A defendant may not be tried a second time for the same offense if the conviction is set aside for insufficiency of the evidence. (*Hin*, *supra*, 17 Cal.5th at pp. 454–455, 468.) Our conclusion that the gang special circumstance and the gang allegation were unsupported by sufficient evidence bars retrial. (*Id*. at p. 468.)

---

General, nor Escandon, discusses the specific intent element, which, for a lone actor such as Escandon, requires "knowledge of at least some of the criminal activities of the gang and its members and intent to further those activities." (*Renteria*, *supra*, 13 Cal.5th at p. 967.) Instead, the Attorney General addresses only the absence of a reason for killing Barajas Jr. which is relevant for whether the murder was committed for the benefit of, in association with, or at the direction of the gang. Escandon does the same. Because we conclude the evidence is insufficient to support this first element of the gang enhancement, we need not discuss the sufficiency of the evidence to support the specific intent element.

### B. Sufficiency of evidence for the gang enhancement as to the attempted murder of Salinas Jr.

In the conclusion of his opening brief, Escandon asserts that retrial of the gang allegation is barred for the attempted murder of Salinas Jr. in count 2. But Escandon's opening brief never substantively discusses the sufficiency of evidence of the gang enhancement as to count 2. The Attorney General asserts that any sufficiency of evidence claim for the gang allegation for count 2 is forfeited. (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 255 [" ' "[I]t is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party." ' [Citation.]"].)

In his reply brief, Escandon asserts that the sufficiency of evidence for the gang allegation in count 2 was "properly addressed in [his] opening brief." He reasons that the circumstances leading to the shooting of Salinas Jr. were identical to those of the shooting of Barajas Jr. which were discussed in his brief.

Anticipating that Escandon inadvertently excluded the Salinas Jr. attempted murder from his discussion about the Barajas Jr. murder, the Attorney General points out additional facts that might support a gang-related motive to kill Salinas Jr.[41] These facts center around Salinas Jr.'s and his father's

---

[41] We commend the Attorney General's thoroughness, and we conclude that it is necessary to reach the issue in the interests of justice. (*People v. Selivanov* (2016) 5 Cal.App.5th 726, 794; *People v. Masotti* (2008) 163 Cal.App.4th 504, 508; see also *People v. Norwood* (1972) 26 Cal.App.3d 148, 152.)

opposition to Cyco Aguirre. Specifically, the Attorney General provides reasons for Escandon to target Salinas Jr, including Cyco Aguirre's exclusion of his father Tigre from his restructured tax collecting operation, Salinas Jr.'s opposition to that restructuring, and Cyco Aguirre's greenlight order to kill Salinas Jr.

The Attorney General appears to claim that the trial prosecutor also highlighted Salinas Jr.'s opposition to Cyco Aguirre as Escandon's gang motive to kill him. But the prosecutor did not go so far as to say that Escandon's loyalty to Cyco Aguirre or his effort to fulfill the greenlight order motivated his attempt to kill Salinas Jr. At most, the prosecutor mentioned the conflict between Tigre and Cyco Aguirre and merely implied that Escandon had the gang motive to kill Salinas Jr. because he would naturally take Tigre's side as his son.[42]

---

[42] The prosecutor first discussed Escandon's 2003 attempted murder of Salinas Jr. by stating, "We know from evidence that was presented that there was a fight that broke out, an argument that broke out . . . between several members there, and that included this defendant here, 'Lokito,' and it included Alfred Salinas[, Jr.] and Frank Barajas[, Jr.]"

The prosecutor changed topics, stating, "Now, again, it's interesting, it's important to note that at this time period, there is that slow rift developing up in Pelican Bay, between the Aguirre crowd, those coming from Five-Seven section, which Joe Escandon is part of, and the Lil Tigre crowd, the one that is separated out by Big Tigre. Big Tigre is out there; he's having issues with the Aguirre crowd, and Lil Tigre his son."

The prosecutor returned to discussing the 2003 incident between Escandon, Barajas Jr., and Salinas Jr., stating, "An argument breaks out, including the son of Big Tigre, and Joe Escandon at that point ends up killing them [*sic*]."

54

Not surprisingly, the prosecutor did not explicitly argue that Escandon attempted to kill Salinas Jr. because of loyalty to Cyco Aguirre or because of the greenlight order. No evidence supported Escandon's loyalty to Cyco Aguirre at the time of the Salinas Jr. attempted murder in 2003, nor Escandon's knowledge of the conflict between Cyco Aguirre and Tigre at that time. According to Campbell, while he was in Pelican Bay state prison from 1998, he discussed the Mexican Mafia tax collecting operation with Cyco Aguirre, who would become its "main director." Campbell also testified that during this time, Tigre became an outcast from the Mexican Mafia. But Campbell was not released from Pelican Bay until 2004.[43] Prior to his release from Pelican Bay in 2004, Campbell spoke to Cyco Aguirre about a list of people who would need to change their alliances regarding the tax collecting operations or face elimination. The list included Salinas Jr. After Campbell was released in 2004, he met Escandon for the first time. Not until that time did Campbell discuss the persons on the greenlight list with Escandon.

No reasonable trier of fact could have found that at the time of the Salinas Jr. shooting in 2003, Escandon aligned with

---

[43] The record is not clear as to the date Campbell was released from Pelican Bay. Initially, he testified that he was released in April 2004. But then he stated that he was in custody for an arrest for, and conviction of, unlawfully possessing body armor in April 2004. He further testified that he was released from Pelican Bay for two and a half months to three months before that arrest. If Campbell's estimates were correct, he was either arrested for the body armor in June or July or he was released from Pelican Bay in January or February 2004.

Cyco Aguirre, knew about the conflict between Cyco Aguirre and Salinas Jr.'s father, or attempted to follow the later greenlight order against Salinas Jr. We conclude that substantial evidence does not support Escandon committing the attempted murder of Salinas Jr. in count 2 for " 'the benefit of, at the direction of, or in association with any criminal street gang.' " (*Albillar*, *supra*, 51 Cal.4th at p. 59.) We reverse the jury's true finding of the gang enhancement as to count 2. The double jeopardy clauses of the state and federal constitutions bar retrial of this enhancement as to count 2. (*Hin*, *supra*, 17 Cal.5th at pp. 454–455, 464)

### C.    *Instructions did not include changes by Assembly Bill No. 333*

Escandon asserts that the instructions for the gang murder special circumstances for the murders of Barajas Jr. and Real in counts 1 and 4, respectively, and the gang enhancements as to counts 1, 2, and 4 did not include the changes to the law made by Assembly Bill No. 333.[44] He further argues that the deficient instructions were prejudicial. The Attorney General concedes. We agree and accept the Attorney General's concession.[45]

Effective January 1, 2022, Assembly Bill No. 333 (2021– 2022 Reg. Sess.) amended section 186.22. (Stats. 2021, ch. 699,

---

[44]    The trial court read CALJIC No. 8.81.22 for the gang murder special circumstance and CALJIC No. 17.24.2 for the gang enhancement.

[45]    Because we accept the Attorney General's concession that the special circumstance and enhancement for count 1 must be reversed for insufficient evidence, we need not address the instructions for the gang murder special circumstance and gang enhancement as to that count.

§§ 1–5; *People v. Cooper* (2023) 14 Cal.5th 735, 738 (*Cooper*); *Hin*, *supra*, 17 Cal.5th at pp. 460.)  The amendment narrowed the definition of a "criminal street gang" as used for the gang enhancement in section 186.22, subdivision (b) and the gang murder special circumstance in section 190.2, subdivision (a)(22).  Assembly Bill No. 333 changed the definition to an "ongoing, *organized* association or group of three or more persons . . . whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity" (§ 186.22, subd. (f), italics added), rather than "individually *or* collectively engage in . . . a pattern of criminal gang activity" (Former § 186.22, subd. (f), italics added).

A "pattern of criminal activity" under former section 186.22, subdivision (e) required two or more predicate offenses committed "on separate occasions" or by evidence of such offenses committed "by two or more persons" on the same occasion.  The amendment changed the requirements of a "pattern of criminal activity" in four ways.  First, a pattern of criminal activity now requires the predicate offenses to be separate from the currently charged offense or offenses.  (§ 186.22, subd. (e)(2).)  Second, the last predicate offense must have occurred within three years of the commission of the currently charged offense.  (*Id.*, subd. (e)(1).)  Third, it requires that the predicate offenses were committed by two or more gang "members," as opposed to "persons."  (*Ibid.*)  Fourth, the predicate offenses must have "commonly benefited a criminal street gang."  (*Ibid.*)

Assembly Bill No. 333 narrowed the "common benefit" for the gang by the commission of an offense to be "more than reputational."  (§ 186.22, subd. (g); *Hin*, *supra*, 17 Cal.5th at p. 461; *People v. Tran* (2022) 13 Cal.5th 1169, 1206.)  The prosecution must show how the predicate offenses provided an

actual common benefit to the gang, and that they did not merely enhance the reputation of its individual members. (*People v. Lamb* (2024) 16 Cal.5th 400, 450 (*Lamb*).)

Assembly Bill No. 333 applies retroactively to nonfinal judgments as we have here. (*People v. Lopez* (2025) 17 Cal.5th 388, 396.) The instructions read to Escandon's jury preceded the effective date of Assembly Bill No. 333 and his appeal was pending on that effective date. The parties agree that the new requirements in section 186.22 apply retroactively to Escandon's case on appeal under *In re Estrada* (1965) 63 Cal.2d 740, 745. (*Cooper*, *supra*, 14 Cal.5th at pp. 738–739.)

We must reverse the gang enhancements and the gang murder special circumstance if " 'any rational fact finder could have come to the opposite conclusion' " regarding the new requirements of Assembly Bill No. 333. (*Hin, supra,* 17 Cal.5th at p. 462; *Cooper, supra,* 14 Cal.5th at p. 739; *Lamb, supra,* 16 Cal.5th at p. 453.)

Officer Elias Villasenor testified as a prosecution expert on the Avenues gang. He testified about three predicate acts to support the Avenues gang's pattern of gang activity, including three robberies committed by Jose Luis Argumedo on June 3, 2000, two murders, an attempted robbery, and a burglary committed by Porfirio Avila on November 3, 2000, and a robbery and a carjacking committed by Leo Cienfuegos on November 13, 2003. The prosecution introduced certified minute orders for each predicate act, containing the superior court's case number, date of conviction, and other information about procedural history. Officer Villasenor opined that each person was an Avenues gang member.

Officer Villasenor also testified that Cienfuegos, Argumedo, and Avila committed their respective offenses for the benefit of the Avenues gang. In unclear language, Officer Villasenor testified that the offenses committed by Cienfuegos benefited the gang "based upon his status within the gang, being the fact [*sic*] the magnitude of the carjacking and the several robberies he committed. And also to benefit the Avenues Street gang." Officer Villasenor merely answered, "yes," when asked if Argumedo committed the robberies for the benefit of the Avenues gang. Also without elaboration, he testified that Avila committed the murders and other crimes to benefit the Avenues gang and his status in the gang. For each case, Officer Villasenor did not provide additional details about the crimes or the nature of the benefit provided to the gang.

As stated, because of the amendment by Assembly Bill No. 333, section 186.22, subdivision (g) now requires the predicate offenses to provide a benefit beyond enhancing reputation and status of individual members. It suggests non-reputational benefit to include "financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).) Officer Villasenor's testimony did not establish that the predicate offenses provided any benefit to the Avenues gang. (*Cooper*, *supra*, 14 Cal.5th at p. 743.) Nor did they preclude a jury from reasonably concluding that any benefit was merely reputational. (*Lamb*, *supra*, 16 Cal.5th at p. 451.) A rational juror could have found the requirements omitted from the instructions to be unsupported. We cannot conclude that the instructions read to the jury were harmless beyond a reasonable doubt. (*Cooper*, at p. 739.)

59

The error requires reversal of the gang murder special circumstance in count 4 and the gang enhancements in counts 2 and 4.[46] (*Hin*, *supra*, 15 Cal.5th at p. 463.) Because we conclude that the evidence was insufficient only under the law as amended after the trial by Assembly Bill No. 333, not the law in effect at the time of the trial, the District Attorney may retry this special circumstance and these gang enhancements. (*Hin*, at pp. 464, 509; *Lamb*, *supra*, 16 Cal.5th at p. 456; *Cooper*, *supra*, 14 Cal.5th at pp. 746–747.)

## VI. Inquiry into the direction of the jury's numerical division

Escandon argues that the trial court coerced the jury into reaching a verdict on the special circumstances by ordering it to resume deliberations after inquiring about the numerical division of its voting and the possibility of reaching a unanimous verdict. We disagree.

### A. Additional facts

On November 7, 2019, at 4:05 p.m., the jury began deliberations. On November 19, 2019, the eighth day of deliberations, the jurors sent a note to the court, requesting help on how to proceed if they could not agree on a special circumstance. At 11:35 a.m., the trial court excused the jury for

---

[46] Because we accept the Attorney General's concession, we need not address Escandon's alternative argument that reversal of the gang murder special circumstances and gang enhancements is required based on the possibility that the jury could have relied on the charged offenses rather than the predicate offenses in finding a pattern of criminal activity.

the rest of the day. The court told the prosecutor and defense counsel that it would answer the jury's questions, order additional argument by the attorneys, or direct the jury to continue with deliberations, after inquiring "how they've voted, how many votes, what the division is." Neither counsel objected.

On November 20, 2019, at 9:25 a.m., the foreperson confirmed that the jury was deadlocked. The court offered to answer legal questions or read back testimony. But the foreperson stated that he did not believe "anything along those lines" would assist with breaking the deadlock and reaching a unanimous verdict.

The court began polling the jurors with Juror No. 1 and Juror No. 2 stating the jury was "deadlocked." The foreperson stated that three votes had been held. The court asked, "[W]as it, you know, 8 to 4? 10 to 2? 11 to 1? 6 to 6?" The foreperson clarified that two votes had been held. The exchange proceeded as follows:

> "Court: What was the first vote?
>
> "[Foreperson]: The numbers were 2, 3, and 7.
>
> "Court: Okay. That is an unusual configuration, and we'll get into that. What was the second vote?
>
> "[Foreperson]: Two and 10.
>
> "Court: Okay. Pardon me if on the first one I don't understand what 2, 3 and 7 means, because normally it's—
>
> "[Foreperson]: Well, your honor on the form itself it says 'true' or 'not true,' however, we added 'not sure' in this case, so that is why we have three numbers rather than two numbers.

"Court: Okay. What does the two represent? The people—the two people, what did they vote for? [¶] . . . [¶]

"[Foreperson]: Two true; three not true; seven not sure.

"Court: And then the vote, the second vote, which is 2–10, what does that represent?

"[Foreperson]: Two true and 10 not true.

"Court: Okay.

"[Foreperson]: I do recall at the very end before leaving there was a third, and I believe it was three not true and nine true.

"Court: Now you've changed the whole thing around.

"[Foreperson]: I'm sorry. I misspoke on the last one. [¶] . . . [¶]

"Court: I don't understand anything about that third one.

"[Foreperson]: That's fine. We'll just dismiss that, because we are not on the same page.

"Court: Was there a third vote or not?

"[Foreperson]: I'm going to say no, because we don't have it noted."

Juror No. 2 informed the court that it could "break the logjam" if it would clarify the last two paragraphs of CALJIC No. 8.80.1, beginning with " 'you must decide separately each special circumstance alleged in this case.' " The court explained that the two special circumstances were not dependent on each other and the jury had to decide each one separately. The court further explained, "You don't literally have to unanimously agree. We do

have deadlocked or hung juries.  But in order for there to be a verdict, you must unanimously agree."  The court stated, "All I've done is converted what it says into more simple English . . . there are two special circumstances, they have to be individually and separately looked at.  You have to resolve each one separately.  And then when you resolve it, you have to do it unanimously."  Juror No. 2 replied, "That helps.  That helps us tremendously.  Because we weren't sure."

The court also asked Juror No. 2 if a third vote was taken.  Juror No. 2 responded that there was a third vote "right before [they] left" with nine "true" and three "not true."

The court continued polling the remaining jurors.  Juror No. 3 and Juror No. 10 stated the jury was deadlocked.  Juror No. 4, Juror No. 5, Juror No. 6, Juror No. 8, and Juror No. 9 told the court that further deliberations would result in a verdict.  Juror No. 7, Juror No. 11, and Juror No. 12 stated a verdict was possible with further deliberations.

The court conferred with both counsel and without objection from either, ordered further deliberations.[47]  Before the

---

[47]    The court told the jury:
> "At this time, based on the interviews and discussions that we've had, I am going to require you to continue deliberating.  I am going to suggest, or at least welcome, if you have any questions or clarifications that you need on the jury instructions, if that is something that you need, I'm not saying you have to do that, but if that is something you need, write it on the form that we provide, and we will try to answer any questions you have about the actual instructions."

jurors returned to deliberating, the court asked about the direction of the second vote. Juror No. 5 replied that it was two "true" and 10 "not true."

The jury resumed deliberations. The court later answered the jury's question about the specific intent requirement for the gang enhancement. On November 21, 2019, at 10:00 a.m., the jury returned its verdicts, which included true findings on the multiple murder and gang murder special circumstances as to counts 1 and 4.

### B.    *Applicable law*

Section 1140 requires the court to not discharge the jurors, once the trial is submitted to them, until they have reached a verdict and read it in open court. Two exceptions allow discharge without reaching a verdict. First, both parties can agree to discharge the jurors. (§ 1140.) Second, the court can discharge the jurors when "it satisfactorily appears that there is no reasonable probability the jury can agree" after a time "deem[ed] proper" by the court. (*Ibid*.) The court determines in its sound discretion whether there is a reasonable probability the jury can agree. (*People v. Rodriguez* (1986) 42 Cal.3d 730, 775 (*Rodriguez*).)

But the court may not coerce the jury and must "avoid displacing [its] independent judgment ' "in favor of considerations of compromise and expediency." ' [Citations.]" (*People v. Thomas* (2023) 14 Cal.5th 327, 403 (*Thomas*).) Determining whether a trial court has improperly coerced a jury is a separate issue from whether it violated section 1140. (*Thomas,* at p. 403.)

As Escandon acknowledges, a "neutral inquiry" into a deadlocked jury's numerical division allows the trial court to

64

assure that a verdict is rendered under section 1140.[48] (*People v. Carter* (1968) 68 Cal.2d 810, 815 (*Carter*), abrogated on another point in *People v. Gainer* (1977) 19 Cal.3d 835, 851–852 (*Gainer*), disapproved on other grounds by *Valdez, supra,* 55 Cal.4th at p. 163; *People v. Proctor* (1992) 4 Cal.4th 499, 538–539.) Such an inquiry assists with evaluating the probability of agreement. (*Rodriguez, supra,* 42 Cal.3d at p. 776, fn. 14.)

The Supreme Court observed that if the trial court learns the direction of the numerical division, any "urging of agreement . . . creates in the jury the impression that the court, which has also heard the testimony in the case, agrees with the majority of jurors." (*Carter, supra,* 68 Cal.2d at p. 816, abrogated on another point in *Gainer, supra,* 19 Cal.3d at pp. 851–852, disapproved on other grounds by *Valdez, supra,* 55 Cal.4th at p. 163.) But simply asking a jury to resume deliberating after

---

[48] Escandon mentions the federal rule that an inquiry into the jury's numerical division—even when the direction of the vote is neither requested nor revealed—is prejudicial per se. (*Brasfield v. United States* (1926) 272 U.S. 448, 450.) But this federal rule is not binding on state courts. (*People v. Howard* (2008) 42 Cal.4th 1000, 1030–1031; *Rodriguez, supra,* 42 Cal.3d at p. 776, fn. 14.) The California Supreme Court has specifically rejected this rule of procedure for federal courts and upheld the process of inquiring into the numerical division without determining the direction of the vote. (*People v. Breaux* (1991) 1 Cal.4th 281, 319 (*Breaux*); *People v. Valdez* (2012) 55 Cal.4th 82, 160 (*Valdez*); *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 462 (*Bryant, Smith and Wheeler*).) The Court has also denied past requests to overrule decisions permitting a trial court to inquire about the numerical division of a jury. (*People v. Price* (1991) 1 Cal.4th 324, 467.)

discovering the direction of the numerical division is not inherently coercive.[49] (*People v. Sheldon* (1989) 48 Cal.3d 935, 959–960 (*Sheldon*).)

### C.    Forfeiture

The Attorney General concedes that the trial court erred by inquiring into the direction of the jurors' numerical division. But the Attorney General argues that Escandon forfeited his claim. We agree that Escandon forfeited his claim.

Despite multiple opportunities, defense counsel failed to object to the inquiry of the jurors' numerical division and the direction of their vote. (*Thomas, supra,* 14 Cal.5th at pp. 405–406; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1038; *People v. Neufer* (1994) 30 Cal.App.4th 244, 254.) First, prior to the jury entering the courtroom, the court announced to the attorneys its plan to answer the jury's questions, order additional argument by the attorneys, or direct the jury to continue with deliberations, after inquiring "how they've voted, how many votes, [and] what the division is." Neither counsel objected.

---

[49]    Our case differs from *Jiminez v. Myers* (1993) 40 F.3d 976, 980–981, which Escandon also mentions. At the outset, we are not bound by federal court opinions, even though we may consider them for their persuasive weight. (*People v. Brooks* (2017) 3 Cal.5th 1, 90 (*Brooks*); *People v. Linton* (2013) 56 Cal.4th 1146, 1182, fn. 8; *Thomas, supra,* 14 Cal.5th at p. 404.) *Jiminez* involved an inquiry into the jury's numerical division and included the court telling the jury that it approved of progression toward a unanimous verdict and encouraged the holdout jurors to follow the majority. (*Jiminez*, at pp. 980–981.) In our case, the court expressly indicated that a verdict was not necessary, and it is not uncommon for juries to be "deadlocked or hung."

Second, after receiving information about the number of votes, numerical division, and direction of the votes, the court addressed counsel again to indicate its intention to confirm the direction of the second vote and to order further deliberations. Again, neither counsel objected.[50] By consenting to each of the trial court's courses of action, counsel waived his claim of error. (*People v. Debose* (2014) 59 Cal.4th 177, 207.)

### D. *Any assumed error was harmless*

Anticipating forfeiture, Escandon argues that the trial court violated his constitutional right to a fair and impartial jury. Even assuming the trial court erred and Escandon's claim was preserved, we conclude that any error was harmless.

The court's discovery of the direction of voting arose only because of the unusual breakdown of three voting categories— true, not true, and not sure—as reported by the foreperson. After discovering this information, the court did not communicate to the jurors in the voting minority that it wanted them to change their minds or "reconsider their views in light of the numerical breakdown of the votes." (*Brooks*, *supra*, 3 Cal.5th at p. 90.) The court did not exert pressure on the jurors voting in the minority or single them out in any way. (*Valdez*, *supra*, 55 Cal.4th at p. 162; *Gainer*, *supra*, 19 Cal.3d at p. 848, disapproved on other grounds by *Valdez*, at p. 163; *Sheldon*, *supra*, 48 Cal.3d at pp. 959–960.)

Instead, the court simply ordered all jurors to resume deliberations. A court's order to further deliberate is not coercive

---

[50] After the jury returned to the jury room, defense counsel only commented, "This makes no sense. It's very simple."

67

even if all jurors "were negative on the prospects of a verdict." (*Breaux, supra*, 1 Cal.4th at pp. 319–320; *People v. Sandoval* (1992) 4 Cal.4th 155, 196.)  The court never expressed or implied to the jurors that they must reach a specific outcome.[51]  (*Brooks, supra*, 3 Cal.5th at p. 89.)

The court's only statement regarding deliberations was its response to Juror No. 2's question about whether a unanimous finding was required for the special circumstances.  Specifically, the court explained that it was permissible for the jury to deadlock.  The court "explicitly left open the possibility that agreement might not be reached." (*Bryant, Smith and Wheeler*,

---

[51]     Escandon claims that *People v. Talkington* (1935) 8 Cal.App.2d 75, disapproved on another ground in *People v. Friend* (1958) 50 Cal.2d 570, 578, held that inquiry into the direction of the jury's vote requires reversal.  *Talkington* mentioned *Brasfield* and the federal rule that requires reversal when a trial court asks about the direction of a numerical split.  (*Id.* at p. 84.)  But the coercive statement by the trial court was not limited to the mere inquiry into the direction of the split.  When informed by the foreperson about the deadlock and numerical division of the jury, the court commented, " 'Well, if [a verdict] can be reached within the next two hours, well, as far as that is concerned, you are not going to get away from here for some time, and you needn't worry about that at all; you needn't talk about that if you don't agree.  As far as talking to me about getting away, forget it; just retire.' " (*Ibid.*)  *Talkington* held that the trial court's language coerced the jurors, threatening that it would not discharge them unless they agreed on a guilty verdict.  (*Id.* at p. 88.)

Similarly, *People v. Crowley* (1950) 101 Cal.App.2d 71, 75, also cited by Escandon, recognized the potential coercive effect of such "insistence upon an agreement" after learning that the jurors voting to acquit constituted the minority.

*supra*, 60 Cal.4th at p. 462.)  The court ordered the jury to resume deliberations because its explanation appeared to clarify the reason for the deadlock.  The court did not punish the jury for being deadlocked or to otherwise compel a verdict.

Based on the circumstances presented by the court's discussion with the jury, we conclude there was no reasonable probability that a different result would have occurred absent the discovery of the direction of the numerical division, (*Valdez*, *supra*, 55 Cal.4th at p. 164), as well as no violation of Escandon's constitutional rights to trial by an impartial jury and to due process.

## DISPOSITION

We reverse and vacate the true findings on the gang murder special circumstances for counts 1 and 4. We also reverse and vacate the true findings on the gang enhancements for counts 1, 2, and 4. We remand the matter to the trial court to allow the District Attorney to retry the gang murder special circumstance and the gang enhancement for count 4 under the current version of the laws as amended by Assembly Bill No. 333. Principles of double jeopardy preclude retrial as to the gang murder special circumstance for count 1 and the gang enhancement for counts 1 and 2.

In all other respects, we affirm the judgment.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


HANASONO, J.

We concur:



EDMON, P. J.



EGERTON, J.

70